**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3196
_____

CRISTIAN PANIAGUA GUZMAN,
                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
                                        Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No.:  A044-875-630)
Immigration Judge:  Honorable Dorothy A. Harbeck

_____

Argued on September 8, 2014

BEFORE:  RENDELL, GREENAWAY and KRAUSE,
Circuit Judges

(Opinion filed: November 3, 2014)

David G. Katona, Esquire **(Argued)**
Katona & Mir, LLP
49 West 37th Street, 7th Floor
New York, NY 10018

                Counsel for Petitioner


Eric H. Holder, Jr.
Attorney General of the United States
Stuart F. Delery, Esquire
Acting Assistant Attorney General
Civil Division
Jennifer P. Levings, Esquire
Senior Litigation Counsel
Tim Ramnitz, Esquire  **(Argued)**
Trial Attorney
Thomas W. Hussey, Esquire
Trial Attorney
Jason Wisecup, Esquire
Trial Attorney
Office of Immigration Litigation, Civil Division
United States Department of Justice
Ben Franklin Station
P. O. Box 878
Washington, DC   20044

                Counsel for Respondent

## OPINION

**RENDELL**, Circuit Judge:

Petitioner Cristian Guzman appeals from a ruling by the Board of Immigration Appeals ("BIA") that the so-called "stop-time rule," as enacted by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C., 110 Stat. 3009 (1996) ("IIRIRA") (effective April 1, 1997), was not impermissibly retroactive as applied to his 1995 criminal offense. The BIA rejected Petitioner's argument that the application of the stop-time rule poses a "new disability" on his past conduct. For the reasons set forth below, we will affirm.

## I. Background

Petitioner is a 38-year-old citizen of the Dominican Republic. He was admitted to the United States as a lawful permanent resident on October 8, 1994 and has continually resided here since that time. A little more than a year after his admission, New York City police arrested Petitioner and charged him with Criminal Possession of a Controlled Substance, in violation of New York law. Petitioner pled guilty to a lesser possession charge on December 19, 1995, and he was sentenced to three years' probation. In 2005, New York City police again arrested and charged Petitioner with Criminal Possession of a Controlled Substance in violation of

New York law. Petitioner pled guilty and, on December 1, 2005, was sentenced to time served.[1]

The Department of Homeland Security ("DHS") took custody of Petitioner and served him with a Notice to Appear ("NTA") for removal proceedings on March 6, 2012, based on his 2005 conviction pursuant to Immigration and Nationality Act ("INA") § 237(a)(2)(B)(i), which authorized removal of:

> Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

8 U.S.C. § 1227(a)(2)(B)(i). Notably, although IIRIRA made various changes to the immigration laws, the same basis for removal appeared in pre-IIRIRA law as well, which would likewise have rendered Petitioner removable for his 1995 offense. *See* 8 U.S.C. § 1251(a)(2)(B)(i) (1994) (repealed 1996) (using the term "entry" in place of "admission").

---

[1] The Government notes several other of Petitioner's arrests between 1995 and 2005, but we need not recount them here as they do not bear on this case.

4

However, the removal proceedings in 2012 were based on his 2005, not his 1995, conviction.

## A. Statutory Framework

Prior to the passage of IIRIRA, an alien in removal proceedings could apply for a discretionary waiver of deportation, known as a "212(c) waiver" if he could show (1) seven years continuous presence, and (2) that he had not been convicted of one or more aggravated felonies for which a term of imprisonment of at least five years had been imposed. INA § 212(c), 8 U.S.C. § 1182(c) (1994) (repealed 1996); *Perez v. Elwood*, 294 F.3d 552, 556 (3d Cir. 2002). IIRIRA repealed this provision and replaced it with a similar procedure known as cancellation of removal. To be eligible for cancellation of removal, a legal permanent resident alien must (1) be "lawfully admitted for permanent residence for not less than 5 years," (2) have "resided in the United States continuously for 7 years after having been admitted in any status," and (3) "not [have] been convicted of an aggravated felony." 8 U.S.C. § 1229b(a).

However, IIRIRA also mandated a new scheme for calculating an alien's period of continuous residence, whereby "any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien . . . removable from the United States." 8 U.S.C. § 1229b(d)(1)(B). This is commonly known as the "stop-time" rule. *Briseno-Flores v. Att'y Gen. of U.S.*, 492 F.3d 226, 227 (3d Cir. 2007).

5

### B. Petitioner's Removal Proceedings and the Immigration Judge's Decision

Petitioner appeared before an immigration judge ("IJ"), conceded removability as charged, and submitted an application for cancellation of removal. The Government argued that he was ineligible for this form of relief due to the stop-time rule, which stopped his accrual of the requisite seven years' presence required for cancellation of removal upon the commission of his drug offense in 1995. Petitioner argued that application of the stop-time rule of IIRIRA to render him ineligible for cancellation of removal due to his 1995 offense would have an impermissibly retroactive effect. While he acknowledged that the 1995 offense rendered him immediately deportable with no opportunity for relief because he had been in the country for only one year at the time, Petitioner nonetheless argued that he could have tried to delay his deportation proceedings until he accrued the requisite seven years' lawful continuous presence to become eligible for discretionary waiver under former INA § 212(c). Petitioner argued that this strategy was available to aliens prior to the passage of IIRIRA, and the fact that this opportunity was no longer available to him constituted a "new disability," which, under *Landgraf v. USI Film Products*, 511 U.S. 244, 269 (1994), would make its application to him impermissibly retroactive. Petitioner also urged that retroactive application of the stop-time rule was arbitrary and capricious in that it punished lawful permanent residents who committed crimes within seven years of their admission, whereas residents who had accrued seven years' presence before committing qualifying offenses were not subject to the

rule.  Additionally, Petitioner asked to be able to terminate his removal proceedings in order to pursue naturalization.[2]

The IJ held a hearing on February 22, 2013, at the conclusion of which she rendered an oral decision denying Petitioner's motion to continue or terminate his proceedings and finding Petitioner ineligible for cancellation of removal because his 1995 offense stopped his accrual of continuous presence pursuant to the stop-time rule.  The IJ found that the stop-time rule itself was not arbitrary and capricious under *Judulang v. Holder*, 132 S. Ct. 476, 490 (2011).   The IJ denied Petitioner's motion to terminate proceedings to pursue a naturalization application for lack of an affirmative communication from DHS regarding Petitioner's *prima facie* eligibility for naturalization, as required by the BIA's decision in *In re Acosta Hidalgo*, 24 I. & N. Dec. 103 (BIA 2007).

---

[2] In addition, Petitioner requested a further continuance to pursue post-conviction relief pursuant to *Padilla v. Kentucky*, 559 U.S. 356 (2010) (holding that the Sixth Amendment requires defense counsel to advise their clients whether a guilty plea carries a risk of deportation).   The IJ denied Petitioner's request to further continue proceedings to pursue post-conviction relief under *Padilla* pursuant to *Chaidez v. United States*, 133 S. Ct. 1103, 1113 (2013), which held that "defendants whose convictions became final prior to *Padilla* . . . cannot benefit from its holding." As this is not an issue on appeal, we do not address it.

### A. Petitioner's Proceedings Before the BIA and the BIA's Decision

Petitioner raised the same arguments before the BIA, and also urged that the IJ erred in not permitting him to concurrently apply for both a 212(c) waiver and cancellation of removal. The BIA affirmed the IJ's decision. It held that Petitioner's 1995 controlled substance offense stopped his accrual of continuous presence short of the requisite seven years for purposes of cancellation of removal. The BIA explained that the stop-time rule imposed no "new disability" on Petitioner because the 1995 offense rendered him immediately deportable with no possibility of relief had he been placed in deportation proceedings at that time, prior to the passage of IIRIRA, because he lacked the requisite seven years' continuous presence for a 212(c) waiver. The BIA reasoned that "[a]t the time of [Petitioner's] conviction in 1995, he was immediately amenable to deportation from this country under pre-IIRIRA law." A.R. 4. Petitioner's options pre-and post-IIRIRA were therefore no different, and the application of IIRIRA's stop-time rule to him was not impermissibly retroactive.

The BIA also rejected Petitioner's contention that he should have been permitted to simultaneously apply for a 212(c) waiver and cancellation of removal. It observed that 8 U.S.C. § 1229b(c)(6) explicitly precludes an alien from applying for both 212(c) waiver and cancellation of removal and that, even if he could obtain a 212(c) waiver notwithstanding his 1995 conviction, "the conviction would still be deemed to have ended [Petitioner's] period of continuous residence for purposes of cancellation of removal because the granting of 212(c) relief does not serve to

8

universally pardon, expunge, or eliminate all negative immigration consequences stemming from an alien's criminal conviction." *Id.*

In addition, the BIA ruled that the IJ properly declined to terminate Petitioner's removal proceedings under 8 C.F.R § 1239.2(f) because he failed to attempt to obtain an affirmative communication from the DHS addressing his *prima facie* eligibility for naturalization.

## B.    Arguments on Appeal

On appeal, Petitioner repeats the same arguments that the BIA rejected.  Relying on *I.N.S. v. St. Cyr*, 533 U.S. 289 (2001), he argues that an alien making the decision to forego his right to trial and plead guilty, like the petitioner in *St. Cyr*, does so assuming the state of the law of the time: when Petitioner pled guilty to a deportable offense in 1995, he expected to retain the possibility of obtaining a 212(c) waiver from deportation in the future, namely, after being in the country for an additional six years.  He urges that applying the stop-time rule of IIRIRA to pre-IIRIRA conduct forecloses that possibility and is therefore impermissibly retroactive.  Petitioner urges that, but for the stop-time rule, he would have accrued the seven years' requisite presence needed for either type of removal—pre- and post-IIRIRA— prior to his 2005 offense.  Accordingly, he contends, the stop-time rule should not apply to him.

In the alternative, Petitioner argues that the BIA wrongly affirmed the IJ's decision not to terminate removal proceedings to allow him to make a *prima facie* case of eligibility for naturalization pursuant to 8 C.F.R. § 1239.2(f),

based on the fact that he did not have an affirmative communication from the DHS indicating such eligibility.[3] As the regulation at issue states that an alien must make a *prima facie* case of eligibility for naturalization, the BIA's decision in *In re Acosta Hidalgo*, which interpreted this regulation to require a communication from the DHS establishing such eligibility, does not comport with the text of the regulation and deprives Petitioner of the opportunity to do what the regulation says—*i.e.*, establish his *prima facie* eligibility to the court.

The Government argues that no genuine issue of retroactivity is presented here, as Petitioner's removal

---

[3] Section 1239.2(f) provides:

> An immigration judge may terminate removal proceedings to permit the alien to proceed to a final hearing on a pending application or petition for naturalization when the alien has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completed as promptly as possible notwithstanding the pendency of an application for naturalization during any state of the proceedings.

8 C.F.R. § 1239.2(f).

proceedings are predicated on his 2005 offense, which post-dates IIRIRA. Since cancellation of removal under IIRIRA did not exist at the time of Petitioner's 1995 conviction, he had no right to it then, and since Petitioner does not meet the requirements for cancellation of removal, he has no right to it now. In the alternative, the Government argues that we should follow the Fifth Circuit's reasoning in *Heaven v. Gonzales*, 473 F.3d 167 (5th Cir. 2006), and hold that, even if the stop-time rule is being applied retroactively here, such application is not impermissibly retroactive. Petitioner's 1995 controlled substance offense rendered him immediately deportable without eligibility for relief under 212(c) and, as such, application of the stop-time rule created no "new disability" because "[d]eportation is the consequence he receives upon retroactive application of the stop-time rule just as it is the consequence he would have received immediately [in 1995] following his criminal conduct." Brief for Respondent at 23 (quoting *Martinez v. I.N.S.*, 523 F.3d 365, 373-74 (2d Cir. 2008)). The Government adds: "Congress certainly has never invested [Petitioner] with a substantive right to purposefully delay his proceedings or created a settled expectation of benefiting from delays in the administrative process." Brief for Respondent at 24 (citing *St. Cyr*, 533 U.S. at 321-22).[4]

---

[4] The Government also argued that this court lacks the jurisdiction to review a final order of removal under the INA, while conceding that we retain jurisdiction to review questions of law and constitutional claims pursuant to 8 U.S.C. § 1252(a)(2)(D). Petitioner has clearly raised a question of law, the retroactive application of a statute, which affords jurisdiction here.

11

## STANDARD OF REVIEW

We review rulings of the BIA under INA § 242, 8 U.S.C. § 1252(a)(2)(D). Our review is limited to constitutional claims and questions of law. *Id.*; *see also Paredes v. Att'y Gen. of the U.S.*, 528 F.3d 196, 198 (3d Cir. 2008). Where "the BIA adopts and affirms the decision of the IJ, as well as provides its own reasoning," we review both the IJ's and BIA's decisions. *Hashimi v. Att'y Gen. of the U.S.*, 531 F.3d 256, 259 (3d Cir. 2008). We review questions of law *de novo*. *Silva-Rengifo v. Att'y Gen. of the U.S.*, 473 F.3d 58, 63 (3d Cir. 2007). However, we will defer to the BIA's reasonable interpretations of the statutes it is charged with administering. *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999).

## DISCUSSION

Petitioner has not previously disputed, nor does he now, that both his 1995 and 2005 offenses rendered him removable when committed. Rather, he disputes the application of a provision of IIRIRA, the "stop-time rule," which precludes aliens who have committed deportable offenses from being spared deportation if they have accrued seven years of continuous presence in the United States, as that "ability" existed under pre-IIRIRA law. The crux of Petitioner's argument—as it was before the IJ and the BIA— is that the application of the stop-time rule to his 1995 offense to disqualify him from cancellation of removal relief is impermissibly retroactive because it imposes a "new disability" on him for conduct that pre-dates IIRIRA. Specifically, he has been deprived of the opportunity to delay deportation proceedings while accumulating the continuous seven years' presence required for discretionary relief from

12

removal, an opportunity he had when he pled to his 1995 offense. Applying the stop-time rule of IIRIRA, enacted in 1996, disqualified him from any such relief. As we have never written precedentially on the issue of whether the stop-time rule should apply retroactively, we do so here.

## A. Statutory Framework Prior and Subsequent to IIRIRA

As noted above, under the immigration laws in effect in November 1995, when Petitioner committed his first drug offense, legal permanent residents who were subject to deportation, but who had resided in the United States for seven consecutive years, were eligible to apply for a discretionary waiver of deportation under INA § 212(c). *See* 8 U.S.C. § 1182(c) (repealed 1996).[5] "The decision of whether to award section 212(c) relief involved only a balancing of the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether the granting of [a section 212(c) waiver] appear[ed] in the best interests of this country." *Martinez*, 523 F.3d at 368 (internal quotation marks omitted) (alterations in original) (quoting *Kai Tung Chan v. Gantner*, 464 F.3d 289, 295 (2d. Cir. 2006). Notably, although the decision to grant a 212(c) waiver was a discretionary one, a "substantial

---

[5] 8 U.S.C. § 1182(c) (repealed 1996) provides: "Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General . . . ."

percentage" of applications were granted. *St. Cyr*, 533 U.S. at 296 (noting that between 1989 and 1995, over 10,000 section 212(c) waiver applications were granted).

A lawful permanent resident in deportation proceedings could seek a discretionary waiver of deportation under former INA § 212(c), if he could show (1) seven consecutive years of lawful continuous physical presence and (2) that he had not been convicted of one or more aggravated felonies for which a term of imprisonment of at least five years had been imposed. *Perez*, 294 F.3d at 556. Aliens accrued time toward continuous residence and physical presence requirements until they applied for relief. *Martinez*, 523 F.3d at 368. Often, an alien would manage to delay his removal process in order to accumulate seven years' presence, which was one of the reasons Congress passed IIRIRA. *Id*. This delay strategy was the exact abuse of the system Congress intended to correct in IIRIRA by eliminating section 212(c), replacing it with cancellation of removal, and enacting the stop-time rule. *Arca-Pineda v. Att'y Gen. of the U.S.*, 527 F.3d 101, 106 (3d Cir. 2008) (citing H.R. Rep. No. 104–469(I) (1996)); *In re Mendoza-Sandino*, 22 I. & N. Dec. 1236, 1243 (BIA 2000) (same).

IIRIRA, which was enacted on September 30, 1996 and went into effect on April 1, 1997, eliminated the 212(c) waiver, and replaced it with cancellation of removal, INA § 240A(a). Under INA § 240A(a), a legal permanent resident must satisfy three conditions to qualify for cancellation of removal relief: the alien (1) must have been "lawfully admitted for permanent residence for not less than 5 years," (2) must have "resided in the United States continuously for 7 years after having been admitted in any

14

status," and (3) must "not [have] been convicted of any aggravated felony." 8 U.S.C. § 1229b(a). In addition to instituting this new cancellation of removal scheme, IIRIRA established a new stop-time rule in INA § 240A(d)(1) for calculating an alien's period of continuous residence or physical presence. The accrual of continuous presence for purposes of the seven years terminates when the alien has committed an offense "that renders the alien inadmissible to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2) or 1227(a)(4) of this title, whichever is earliest." 8 U.S.C. § 1229b(d)(1)(B). Once the period of continuous residence is terminated, it is not restarted by subsequent events. *Briseno-Flores*, 492 F.3d at 230.

## B. Retroactive Application of the Stop-Time Rule, INA § 240A(d)

In *Landgraf v. USI Film Products*, the Supreme Court confirmed the longstanding presumption against retroactive legislation, emphasizing that "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." 511 U.S. at 265. At the same time, the Court acknowledged that Congress has the power, within constitutional limits, to enact laws with retroactive effect. The *Landgraf* court articulated a two-step test for determining when a statute could be applied retroactively. Under the first step, the court must ascertain "whether Congress has expressly prescribed the statute's proper reach." *Id.* at 280. If the answer is yes, the inquiry ends there. If, however, "the statute contains no such express command," *id.*, the court

15

must move to the second step and decide whether the application of the statute would have an impermissibly "retroactive effect," that is, the court must assess "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 269-70. A statute is impermissibly retroactive if it "takes away or impairs *vested rights* acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a *new disability*, in respect to transactions or considerations already past." *Id.* at 269 (internal quotation marks omitted) (emphasis added).

Congress was silent with respect to the retroactive application of the stop-time rule, while it expressly mandated the retroactive application of certain other provisions of IIRIRA. For example, in the transitional rules, Congress expressly mandated that the stop-time rule applied retroactively to applications for suspension of deportation that were pending at the time of IIRIRA's enactment. *Briseno-Flores*, 492 F.3d at 230. It also expressly mandated the retroactive application of the expanded definition of aggravated felony. *See* IIRIRA § 321(b), 110 Stat. at 3009-628 ("Notwithstanding any other provision of law (including any effective date), the term ["aggravated felony"] applies regardless of whether the conviction was entered before, on, or after [September 30, 1996]."); *see also St. Cyr*, 533 U.S. at 318-19. In contrast, the text of § 1229b(d)(1) says nothing whatsoever about retroactive application. Therefore, we have no trouble concluding that it is ambiguous, and an analysis of whether the application of the stop-time rule is impermissibly retroactive under step two of *Landgraf* is appropriate here.

We disagree with the Government that this case presents no issue of retroactivity at all. Our focus is not

16

merely on the date of the offense that served as the basis for removal and the law in effect at that time. Rather, our focus is broader. As the Court reasoned in *St. Cyr*, the fact "that deportation is not punishment for past crimes does not mean that we cannot consider an alien's reasonable reliance on the continued availability of discretionary relief from deportation when deciding whether the elimination of such relief has retroactive effect." *Id.* at 324. The application of a post-IIRIRA provision, namely, the stop-time rule, to alter the availability of certain relief based on conduct that took place pre-IIRIRA clearly has a retroactive effect. The issue is whether such effect is impermissibly retroactive.

This brings us to step two of *Landgraf*. As noted above, the stop-time rule is impermissibly retroactive if it "attaches new legal consequences" to events completed before the enactment of IIRIRA, that is, if it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." 511 U.S. at 269-70 (internal quotation marks omitted) (quoting *Soc'y for Propagation of the Gospel v. Wheeler*, 22 F. Cas. 756, 767 (No. 13, 156) (C.C.D.N.H. 1814) (Story, J.)). We note that while the inquiry may be broad, the application under step two is very fact-specific. In *St. Cyr*, the Supreme Court held impermissible the retroactive application of the stop-time rule to an alien who had accrued seven years presence prior to IIRIRA but whose removal proceedings did not commence until after the passage of IIRIRA because his right to a 212(c) waiver had vested before the passage of the new law. 533 U.S. at 326. St. Cyr had pled guilty to a removable offense, foregoing his right to a trial, under the assumption that the consequence of doing so at the time

17

would not disqualify him from 212(c) relief. *Id.* at 321-22. IIRIRA replaced 212(c) waiver with cancellation of removal and disqualified St. Cyr from removal relief based on the type of offense he had committed. The Court held that the application of IIRIRA to St. Cyr created a new disability, defining it as the "elimination of any possibility of § 212(c) relief for people who entered into plea agreements with the expectation that they would be eligible for such relief." *Id.* at 321. The Court reasoned that the *quid pro quo* nature of plea agreements and the attendant waiver of some constitutional rights by a defendant, particularly when immigration status is at stake, dictates that attaching new legal consequences or a new disability—namely, elimination of the availability of 212(c) relief—would amount to an impermissible retroactive application. *Id.* Accordingly, the Court held that the section 212(c) waiver remains available for aliens "whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." *Id.* at 326.

Similarly, in *Sinotes-Cruz v. Gonzales*, the Court of Appeals for the Ninth Circuit held that the stop-time rule of IIRIRA was impermissibly retroactive when applied to stop an alien's accrual of seven years' continuous residence when based on "a conviction, obtained pursuant to a guilty plea, for a crime that did not render an alien deportable at the time of the plea." 468 F.3d 1190, 1201 (9th Cir. 2006). In 1993 Sinotes-Cruz pled guilty to two counts of attempted aggravated assault. *Id.* at 1202. The court found it "undisputed that at the time of his plea, his conviction did not render him deportable." *Id.* (citing 8 U.S.C. § 1251(a)(2)(A)(i) (1993)). IIRIRA reclassified his crime,

18

making him deportable for having been convicted of a crime involving moral turpitude, committed within five years of admission, for which a sentence of a year or longer could have been imposed. *Id.* Similar to Petitioner's case, DHS commenced removal proceedings against Sinotes-Cruz based on a deportable offense he committed after IIRIRA's passage. *Id.* at 1197. Although Sinotes-Cruz had accrued the requisite seven years continuous presence before IIRIRA's passage, the Government argued that his time should be stopped on the date of his pre-IIRIRA conviction, which IIRIRA reclassified as a crime of moral turpitude. The court held that the retroactive application of the stop-time rule to Sinotes-Cruz's pre-IIRIRA conviction was impermissible under the second step of the *Landgraf* analysis, reasoning that he had, in pleading guilty, given up valuable rights, including the right to go to trial, "in the justifiable expectation that [his] plea[] would have no effect on [his] immigration status." *Id.* at 1202.

*St. Cyr* and *Sinotes-Cruz* are different from the instant case in two important respects. First, while IIRIRA reclassified the crimes that the petitioners in *St. Cyr* and *Sinotes-Cruz* committed so as to produce harsher effects, no such reclassification took place here. Petitioner's 1995 offense rendered him deportable and ineligible for 212(c) relief, because he had not accrued seven years' continuous residence. IIRIRA did not reclassify this offense or change it in any way. A controlled substance offense rendered an alien deportable in 1995, just as it would today, and eligible for removal relief provided the alien has accrued seven years continuous residence, just as it would today.

19

Second, in both *St. Cyr* and *Sinotes-Cruz*, the petitioners had accrued the requisite seven years' continuous presence to be eligible for 212(c) relief prior to the passage of IIRIRA. They pled guilty to a non-qualifying crime under the reasonable assumption that doing so would not affect their immigration status. Their eligibility for 212(c) relief had vested prior to the time that IIRIRA changed the rules, replacing 212(c) with the stricter cancellation of removal procedure. The same is not true in Petitioner's case. At the time of his 1995 conviction, Petitioner had been residing in the United States for only a year. When IIRIRA was passed in 1996, taking effect in 1997, Petitioner had not come close to accruing the seven years continuous presence required for 212(c) relief. He had no *vested* right because he was ineligible for any form of removal relief when IIRIRA was passed, and is ineligible for any form of removal relief today because the stop-time rule disqualifies him. There have been no "new legal consequences" imposed on Petitioner as a result of the application of the rule. *St. Cyr*, 533 U.S. at 321.

Petitioner's situation is much more akin to that of the petitioners in *Martinez* and *Heaven*. In *Martinez*, the Court of Appeals for the Second Circuit held that the stop-time rule did not have an impermissible retroactive effect when applied to an alien's deportable drug offense, committed prior to the passage of IIRIRA, to prevent him from obtaining cancellation of removal for a deportable crime committed after the passage of IIRIRA. 523 F.3d at 377. The court reasoned that if the alien had been "captured and successfully prosecuted [for his pre-IIRIRA crime] . . . and the INS had obtained a deportation order promptly after he committed the offense, he could have been deported without the possibility

20

of relief because he would not, at the time, have accrued the seven years required by the repealed INA § 212(c)." *Id.* at 374. Essentially, "IIRIRA, as applied to petitioner here, did not change the consequence of [his] criminal act." *Id.* at 375. Similarly in *Heaven* the Court of Appeals for the Fifth Circuit applied the stop-time rule retroactively to an alien who had committed a deportable offense pre-IIRIRA to disqualify him from cancellation of removal, reasoning also that IIRIRA had caused no "new legal consequences to events completed before its enactment." 473 F.3d at 173.

Petitioner seizes on *Vartelas v. Holder* as dictating the outcome in his favor, and specifically its use of the term "new disability." 132 S. Ct. 1479, 1482 (2012). But *Vartelas* does not help Petitioner. In *Vartelas*, the Supreme Court refused to retroactively apply an IIRIRA provision preventing lawful permanent resident aliens from departing, even briefly, from the United States without having to seek admission upon return. Prior to IIRIRA, lawful permanent residents with a felony conviction were able to briefly travel abroad and return to the United States without applying for readmission. *Id.* at 1483. Lawful permanent residents were not regarded as making an "entry" upon their return "from innocent, casual, and brief excursion[s] . . . outside this country's borders." *Id.* at 1484 (internal quotation marks omitted) (alterations in original) (quoting *Rosenberg v. Fleuti*, 374 U.S. 449, 461-62 (1963)). IIRIRA § 1101(a)(13)(C)(v) changed this rule. Under the new law, lawful permanent residents returning from any trip abroad would be regarded as seeking "admission" if they had committed an offense identified in section 1182(a)(2), which included "a crime involving moral turpitude … or conspiracy to commit such a crime." *Id.* at 1485 (citing § 1182(a)(2)(A)(i)). It essentially allowed DHS

21

to refuse entry to legal permanent resident aliens who had committed certain crimes if they traveled abroad, even though, prior to IIRIRA, those aliens were not subject to admission procedures upon their return to the United States. *Id.* at 1485. Vartelas pled guilty to a felony in 1994, and in the years after his conviction and after IIRIRA's passage, he regularly traveled to Greece to visit his aging parents. *Id.* at 1485. In 2003, when he returned from a week-long trip to Greece, he was classified as an alien seeking "admission" based on his 1994 conviction. *Id.* He was placed in removal proceedings and sought relief on the basis that "IIRIRA's new 'admission' provision . . . did not reach back to deprive him of lawful resident status based on his pre-IIRIRA conviction." *Id.* at 1486. The Supreme Court held that application of the new rule to Vartelas was effectively a ban on travel outside the United States. The Court found that this was most certainly a "new disability" in that, due to past events, namely, his pre-IIRIRA guilty plea and conviction, permanent residents situated as Vartelas would lose "the ability to travel abroad" and "face potential banishment." *Id.* at 1487-88. The law in effect when Vartelas made the decision to plead guilty imposed no such restriction. The Court characterized this change as "a harsh penalty, made all the more devastating if it means enduring separation from close family members." *Id.* at 1488 (footnote omitted).

Petitioner faces no such harsh penalty. When pleading guilty, Vartelas did so under the correct assumption that the law at the time of his plea did not preclude him from short travels outside of the United States. IIRIRA imposed a new disability on him by taking from him the ability to travel to visit his aging parents, something he was clearly able to do without any adverse consequences when he pled guilty.

Petitioner, on the other hand, had no right or ability to seek a waiver from deportation when he pled guilty in 1995. The instant he committed his offense before meeting the seven-year residency requirement for suspension of deportation, he was deportable. *See* INA § 237(a)(2)(B)(i), 8 U.S.C. § 1227(a)(2)(B)(i). Petitioner asks us to characterize his "disability" as losing the opportunity to delay his deportation proceedings until he reached the seven years' requisite presence if, hypothetically, such proceedings had been brought against him at the time. He focuses on the word "disability" as if he should have the ability to deliberately delay proceedings or attempt to evade the authorities, hoping to accrue seven years without deportation. But "disability" must mean that one has a present *ability* which is then lost. Petitioner had no ability under prior law, only a hope and speculation. Unlike the petitioner in *Vartelas*, who accepted a guilty plea relying on the existing law that did not bar his right to travel abroad, Petitioner's rights were no different when he accepted his plea than they are today. Neither the opportunity to delay deportation proceedings nor the chance to evade the authorities, with the goal of avoiding deportation in order to become eligible for relief, creates a new disability. Accordingly, the decision to apply the stop-time rule to Petitioner is not impermissibly retroactive.

## C. Petitioner's Remaining Arguments

### 1. Whether the BIA's Decision was Arbitrary and Capricious

Relying on *Judulang*, Petitioner argues that retroactive application of the stop-time rule is arbitrary and capricious and thus, not entitled to any deference. 132 S. Ct. at 490

("We must reverse and agency policy when we cannot discern a reason for it."). In *Judulang*, the Supreme Court considered the eligibility of aliens charged with deportability to seek a waiver under section 212(c), although the statute limited this relief to aliens charged with inadmissibility. The BIA had extended relief under section 212(c) to aliens charged with deportability, but only if the ground of deportation was comparable to a ground of inadmissibility. *Id.* at 480-81. In applying this to aliens who were deportable, the BIA based its grant of relief on whether the ground for deportation charged by DHS had a close analogue in the statute's list of exclusion grounds. *Id.* at 481-82. The Court found this approach arbitrary and capricious because it "hing[ed] a deportable alien's eligibility for discretionary relief on the chance correspondence between statutory categories—a matter irrelevant to the alien's fitness to reside in this country." *Id.* at 484.

Petitioner argues that *Judulang* limits the BIA to interpreting a statute in a way that is rational, non-arbitrary and tied to the purposes of the immigration laws. He urges that the BIA's decision to apply the stop-time rule to him conflicts with the purposes of the immigration laws because it treats legal permanent resident aliens who commit deportable crimes differently, depending on when they committed the crime. Those aliens who commit deportable crimes after seven years' requisite presence are allowed to apply for waiver from deportation, while those who commit a crime before such requisite presence are not. Petitioner's argument is markedly different from *Judulang* in one important respect: his is an objection to the stop-time rule itself, as enacted by Congress, not the BIA's application of it, and "Congress has plenary power to pass legislation concerning the admission

24

and exclusion of aliens." *Acosta v. Ashcroft*, 341 F.3d 218, 226 (3d Cir. 2003). Congress may have rationally concluded that an alien who has resided in the United States for a longer period of time should have a greater right to stay in the country than one who has resided here for a shorter period of time. Because the stop-time rule is one that Congress, and not the BIA, created, the argument that the BIA acted arbitrarily in applying it is misplaced.

*2. Whether the BIA Erred in Finding that Petitioner Could Not Apply for 212(c)Waiver and Cancellation of Removal Concurrently*

Petitioner argues that the BIA and IJ should have allowed him to apply for relief under section 212(c) as well as cancellation of removal concurrently. He argues that although section 1229b(c)(6) provides: "[a]n alien whose removal has previously been canceled under [cancellation of removal] . . . or who has been granted relief under section [212(c)]" shall be "ineligible for relief," 8 U.S.C. § 1229b(c)(6), this provision does not make clear whether aliens may apply concurrently for both, based on its use of the word "previously." Additionally, he points to *Munoz-Yepez v. Gonzales*, 465 F.3d 347 (8th Cir. 2006) (denying concurrent applications based on Congressional intent) and *Garcia-Jimenez v. Gonzales*, 488 F.3d 1082 (9th Cir. 2007) (denying concurrent applications based on statutory interpretation) to demonstrate that the meaning of this provision is unclear, and urges this court to resolve this issue. The BIA believed that there was no ambiguity in 8 U.S.C. 1229b(c)(6), in that it clearly precluded an alien from applying for both, but noted in addition that even if Petitioner's 1995 conviction were waived under section

212(c), the conviction would still end his period of continuous residence, because "the granting of 212(c) relief does not serve to universally pardon, expunge, or eliminate all negative immigration consequences stemming from an alien's criminal conviction." A.R. 4. On appeal, Petitioner continues to assert the right to apply for 212(c) and cancellation of removal concurrently, acknowledging that he needs both forms of relief in order to prevail. Petitioner's counsel conceded during oral argument that, if we concluded that the application of the stop-time rule was not impermissibly retroactive as applied to Petitioner's pre-IIRIRA crime, we need not reach the issue of whether concurrent applications are permitted. As we have so held, the issue is moot. We note in addition, however, that, as the BIA observed, Petitioner is also foreclosed from urging that if a 212(c) waiver were granted, his 1995 conviction would not serve as a bar to cancellation, because in *Rodriguez-Munoz v. Gonzales*, 419 F.3d 245, 248 (3d Cir. 2005), we specifically held that a grant of 212(c) waiver does not nullify the underlying conviction and accordingly, it still exists for purposes of cancellation of removal analysis. Therefore, even if Petitioner were to somehow be granted a 212(c) waiver, he would still be barred from cancellation of removal relief under *Rodriguez-Munoz.*

*3. Whether the BIA Improperly Refused To Dismiss Petitioner's Case so He Could Pursue Naturalization*

Finally, Petitioner contends that the IJ should have allowed him to terminate his removal proceedings so that he could pursue naturalization. In making this argument, Petitioner urges that the BIA's interpretation of its regulation governing the termination of removal proceedings in *In re*

26

*Acosta Hidalgo*, 24 I. & N. Dec. 103 (BIA 2007) is inconsistent with the plain language of the requirements of the regulation. The regulation at issue provides:

> An immigration judge may terminate removal proceedings to permit the alien to proceed to a final hearing on a pending application or petition for naturalization when the alien has established *prima facie* eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors . . . .

8 C.F.R. § 1239.2(f). He contends that in *In re Acosta Hidalgo*, the BIA improperly added a requirement that is not set forth in the regulation, namely, that DHS must attest to an alien's *prima facie* eligibility for naturalization, through an affirmative communication, prior to termination of removal proceedings. However, petitioner fails to acknowledge our decision in *Zegrean v. Att'y Gen. of the U.S.*, 602 F.3d 273, 274 (3d Cir. 2010), in which we upheld this interpretation as reasonable. We decline to revisit that ruling here. Even if we were to do so, Petitioner's argument suffers from another procedural flaw—namely, his failure to ever present his application to a local USCIS field office. The absence of evidence demonstrating that Petitioner took any measures to formally request a *prima facie* determination from USCIS undermines his argument that his removal proceedings should have been terminated pursuant to 8 C.F.R. § 1239.2(f).

## CONCLUSION

Petitioner's argument that the loss of opportunity to delay deportation proceedings creates a "new disability" under *Landgraf* is unconvincing. Petitioner was deportable in 1995 with no avenue for relief, just as he is deportable today. The passage of IIRIRA did not change the legal consequences that face Petitioner as a result of his 1995 and 2005 convictions. Petitioner's remaining arguments are far less compelling, and fail just the same. Accordingly, we affirm the BIA and deny Petitioner's petition for review.